Your Honor, may it please the Court, I'm Brian Miller for the Plaintiff Appellant Lee Burrington. If possible, I want to try to reserve five minutes for rebuttal. Thank you. So we think that the sort of the big-ticket items for the appeal, of course, we're here to answer any questions that the panel has, but we see them as whether there's a duty under the Morrow v. Bank of America case, and we also see the major issue as being whether this was a self-concealing tort under the Blackburn v. Blue Mountain Clinic case. And, you know, if we had to sum it up in a sort of shorthand, we would say that the district court erred here because it got too stuck in the facts of Morrow and lost sight of what the holding was. The holding was broader than the facts of the case itself. And we think that what the court was trying to do, what it was wrestling with in the Morrow decision, as it stated, was figuring out how banks and borrowers stand in relation to one another in the modern-day world, which is different than the way banks used to operate for most of the 20th century. And Morrow was trying to account for that fact. And it did say in the opinion, and I think that most of the duty analysis, well, all of the duty analysis occurs on pages 1177 and 1178. That's really where the nub of that analysis is. But in there they said, you know, sometimes in the modern-day world, the bank gets thrust into the role of the advisor. And so what we're looking at is to figure out when has the bank exceeded its role as an ordinary lender of money. And when it looked at some prior Montana cases which would provide context, one of them was the case of Deist. Another one was the case of Kohl's Department Stores. And, you know, the Deist case was, it was a different kind of case, but it was one in which the court said, yes, there's a duty there. And the Kohl's was the other type of case where they said there was no duty. And the difference between those two cases could be summed up like this. In the Kohl's case where there was no duty, there were these two brothers that ran a department store in Billings, Montana, and they had a longstanding relationship with the local bank, I think it was First National Bank of Conrad. And there was a relationship there because one of the owners had been a frat brother with a guy at the bank. At some point the bank said, look, the way you're financing your store doesn't make sense. You use a 90-day reapplication on promissory note. Why not shift into long-term financing? And they did that, and things went bad. The court said that's pretty standard for a bank to tell somebody to do that, to change how they are doing their financing. That's not abnormal. And the other case of Deist was a little bit different because in Deist there was a ranch wife widow who, after her husband died, had a real problem with her ranch, and they had been doing business with the first, I forgot the name, I'm not sure, that may be the Bank of Conrad, actually, that case. In any event, they'd been doing business with the bank for a long, long time, and they ended up, the bank tried to find them some people to buy the house, to buy the ranch for them. Eventually they had a lot of deals that fell through, and they got one that stuck. But there was a problem with that deal. Prior to that deal going through, as the ranch wife found out later, one of the bank's officers had entered into an operating agreement with one of the buyers to take the ranch and sell it. And she said, wait a second, I didn't know about that before we did this transaction. I'm just going to say, so what did the banks do in this case that was assumed that duty? Sure. It was telling, it was giving affirmatively misleading advice about the availability of a loan modification. Because what they told Mr. Burrington was that you should apply for HAMP. What was wrong with that? Because it didn't, well, according to what he later found out, that didn't exist for his loan. But that doesn't tell him he's going to get it. There was no advice. He says you can apply, but it doesn't say you'll get it. So that's where I'm really having trouble linking these up with the fiduciary duty cases. So what did they do besides say, please, you know, apply for this? Anything else that we look at? And were your friends. No, we're here to try to answer these questions. So there's a lot of, so that was what started the transaction, okay? Now, I would say that that is not, it's not normal for a bank to tell a borrower to pursue a course of action which has no reasonable prospect of leading to a loan modification. Wouldn't they have to sort of ask? Are you interested in a loan modification? I mean, you know, it's a bank. Bank of America has taken a lot of bad press, and they ask. I don't think that's what the cases that Morosited say. In the Crilly case. Well, how about the Anderson case? Yeah, the Anderson case we think is a different species. That was a case where there was no duty because the bank gave them bad information and quickly corrected it. And also I think what also in the Anderson case. I think in Anderson the bank suggested that they apply for a loan, correct? Yes. Or a loan modification. Loan modification, yes. And then they said, oh, wait, sorry, that's wrong. We shouldn't have told you to do that. So is there anything else besides apply for a loan modification? They say stop paying your mortgage, only pay a small amount, a good portion of your mortgage payment. They do anything like that in this case? No. No. What else? Then is there anything else? Oh, yes. I mean, there's, I mean, that's where it starts. And what happens is then for the next four years, they're chronically mishandling his application. They're not processing it in the correct time frames. One thing I can point out that's pretty important here is that in April of 2010, when they're still, he has a HAMP, I think it was a second or third HAMP application that's pending. He's thinking, well, this isn't going anywhere. There's another program out there called the HAFA program. Can I try that program? And they say, no, you're in HAMP. You can't use that program. So what they're doing, Your Honors, they're sticking him in this cycle. And if the Court looks at what constitutes damages under Morrow and under Jacobson, it is things like giving the misleading advice because another thing that's happened as a practical matter, you know, I was trying to think of an analogy. If Bank of America had told Mr. Burrington that if he wanted a loan modification, please send letters to the Department of Treasury asking them to modify your loan, okay, that's not going to lead to a loan modification. Neither is applying for HAMP. It's affirmatively misleading. It has the same legal effect. They're sending him down a path which is — How was he harmed? Well, because he missed opportunities for — What did he miss? Well, he missed — one example was the HAFA program. That's a way to get out from under a bad situation. If he can't — if he cannot get a loan modification, there's another way that mitigates damages to the borrower. Because remember, he ended up having to file for bankruptcy because everything's just sitting out there in nowhere, no man's land, and he's not getting any answers at all. So that's one example. He — you know, what he was told in 2014 was that there was an in-house modification possible. With Bank of America? That was when the other servicer, Aquin, took over. Bank of America never told him that HAMP wasn't available. And in fact — Aquin's still in the — what did you allege that Aquin did in this case, other than gave him too high an offer in the end? Well, we thought — yeah, that's — that was the primary allegation. And, you know, to be fair, you know, if Aquin gave him a decision far quicker than Bank of America did, and Aquin actually told him, although they still haven't given him the documents to prove it, but they told him that HAMP wasn't an option. But still there was a delay of over six months, which under Jacobson and Morrow can be damages. And what we've said, Judge, is that — I don't know if I'm — is that — Oh, I'm sorry. I just — the other thing is that U.S. Bank is the owner of this note and both of its agents. First it had Bank of America. Then it had Aquin. And we're saying, look, U.S. Bank, your guy caused this situation. If you'd have given our client a decision within 30 days, 60 days, and maybe just say, hey, look, there's no loan modification, at least he can mitigate his damages. Maybe he can sell the place. We will never know because they misled him affirmatively. And that's why I think the Court should feel comfortable finding a duty, because the advice that they gave my client had no more chance of leading to a loan modification than telling him to write a letter to President Obama would. I mean, he doesn't know. And one of the cases that was cited by the district court in sort of talking about the self-concealing nature of this tort, because we think if the Court looks at the Blackburn Blue Mountain Clinic case, which we cited in the briefs, that case talks about the fact that if the party, in that case a doctor, has the superior knowledge and they don't disclose it to the patient in that case, that tort by its nature is self-concealing. In the case of Blackburn, the woman shows up at the clinic and the doctor, and this happened in Kalispell, Montana, the doctor says, look, the father of your husband is HIV positive. Your baby will be HIV positive and won't live very long. So she has an abortion over that. It's a pretty bad situation. That happened in 1990. In 1995, she's talking to a lawyer who says, oh, wait a second, that's ridiculous. And the Montana Supreme Court said, look, the doctor is the one with the superior range of facts there. They didn't tell you that. That tort by its nature is self-concealing. Here, Mr. Burrington, as the borrower, does not have in his range of facts to know whether his loan is HAMP eligible. Let's go back to when Bank of America first told Burrington. Because there was sort of a series of exchanges back in December of 2010, ending with Bank of America saying, yeah, it doesn't look like HAMP, your lender will take HAMP, or it doesn't look like you're HAMP eligible. Isn't that right? No. They said we're not going to offer you that. We'll look at it in-house. But they did not tell him there's no HAMP availability. And that's what he alleges. And then on the July 8, 2013 letter, they send him a letter which says one of the options for you is HAMP. So, and that's July 2013. If it's okay, if there are no questions, I would like to reserve the balance of my time. Thank you. May it please the Court. Matt Fitzgerald on behalf of Bank of America. I'm sharing argument time today with my friend, Mr. Hoffman, who represents U.S. Bank in Occoquan. And I'll first address the negligence in the Montana Consumer Protection Act claims. Mr. Hoffman will speak to the declaratory judgment claim based on assignment of the mortgage. So, first, the negligence claim under Montana law failed to state a claim, correctly dismissed on the ground that there was no duty between the banks and Mr. Burrington. And just to clear up one point, this claim was brought against all of the appellees, but on page 19 of the opening brief, Mr. Burrington said he was not appealing this against Occoquan. So we can set aside Occoquan. The general rule, of course, is that between lender and borrower, there is no duty and tort. In Morrow, the Montana Supreme Court came along and identified a narrow exception for that in the context of mortgage lending and called that exception, quote, special circumstances. The Anderson case, which is a subject of 20HA briefing in this court, also from the Montana Supreme Court, called the same thing, quote, extraordinary circumstances. So we're looking for extraordinary circumstances that would create a duty between the Bank of America and Mr. Burrington, and there are no such extraordinary circumstances in this case. It's important, in Morrow, the example in Morrow of the bank telling the borrower to default, telling him to ignore notices of foreclosure, telling him to pay less than it seemed like he owed, those are the rare example of the bank taking on a relationship of trust, essentially becoming a financial advisor to the borrower, and there's nothing like that in this case. Did the bank encourage Mr. Burrington to apply for a hand? Yes, Your Honor. And did they string him along? I mean, I think that's the real question, is it went on forever. Yes, Your Honor. So the allegation is that they strung him along, and, of course, we're on the motion to dismiss stage, so we haven't had an opportunity to dispute the facts. But as alleged, yes, it's that they strung him along. But there isn't anything about that that is the same as becoming a financial advisor to Mr. Burrington. There's nothing that ---- Did they lead him to believe that he could qualify for a HAMP? They suggested repeatedly that he apply, according to his allegations, sure. But that's a far cry short of saying you should default on your loan. I mean, he had already defaulted on his loan. And it's part of the ordinary lender-borrower relationship, when a borrower has defaulted, that the bank look into options to avoid the ultimate foreclosure. And the Montana Supreme Court recognized this in the Anderson case when it said, quote, The mere offering and administration of HAMP loan modifications is insufficient to give rise to a special relationship or duty. That's paragraph 10 of the Anderson. Did the Comptroller General tell these banks, these Federal banks, that they had to alert their customers about the availability of a HAMP loan? I'm not sure, Your Honor. By this time, it was certainly common practice for the banks to be notifying people that this program existed. And the government was, yes, pushing the program, pushing investors to be part of the program, pushing servicers to do it. So essentially then, under Morrow and Anderson, which are these two cases in similar context from the Montana Supreme Court, there's no duty in negligence here. So to turn to the Consumer Protection Act claim. But before you move on to that, there's some suggestion in the briefing and in the complaint that he had a claim for negligent misrepresentation. Yes, Your Honor. He didn't. He didn't make such a claim. He didn't provide. Well, he didn't label it. He didn't label it. And he didn't plead it adequately to give fair notice. And essentially in the briefs, his reply brief says, well, they moved to dismiss it, so they must have had notice of it. So shouldn't the district court have given him leave to amend then? I mean, why? There wasn't really any analysis of futility or was there? There was briefly, Your Honor, yes. So he never has asked for leave to amend. And on top of that, he's never said what additional facts he could put in in order to make that claim. So in the absence of that, the district court, in its adopting the findings and recommendations, it did make a finding that it would be futile to amend on the ground that there had been nothing said about what facts could possibly change the situation. So he alleged the theory but no facts, basically? He pleaded. So the complaint has these four counts in it, labeled and numbered. And under count two for negligence, there's one paragraph that lists the elements of negligent misrepresentation. But there's no factual — there's nothing to say this jumps out of negligence. Here are the facts, say, to show what the justifiable reliance was, which is a key element. Or what the factual misstatement was. Misstatement was. Exactly, yes, particularly. So it seemed in context like it's baked into the negligence claim that he was making, which requires this duty element. That's what was moved to be dismissed. The banks did not jump in and say negligent misrepresentation should be dismissed. It's not in the motion to dismiss briefing, which is in the record of the district court at docket 15 and 21. So there wasn't fair notice of that claim. Now, the Consumer Protection Act claim is that as to Bank of America, it's the one that's untimely. Against Ocwen, it simply didn't state a plausible claim. Ocwen provided him a loan modification offer quickly. But as to Banna, it's untimely. And it's beyond — so it's undisputed, it's a two-year statute of limitations. Undisputed, the claim was filed more than two years after Bank of America stopped being his servicer. So it comes down to tolling. And there's a lot of discussion of self-concealing, what sort of fact counts as self-concealing. But the concealing is only one element of tolling. And so what happened here is the district court cut through that and said, regardless of these things, Mr. Burrington is aware of the basis of his claim, and he can't get tolling regardless of the self-concealing element. And what the district court did is it noted that in the fall of 2010, for instance, he was told at least three times that he wasn't going to get this HAMP modification by Bank of America. That's in the excerpts of record between pages 83 and 85 citing to the complaint. And so if we take those and we look at the basis for his Consumer Protection Act claim in the complaint, which is at excerpts of record 101, we see the basis of his claim is contradictory statements, sending him notices of foreclosure, being confused about his account. All of these things are interactions between Mr. Burrington and the bank that he would have known about, that it appears he knew about when they happened. So there's no secret, hidden thing that he doesn't qualify for HAMP that's key to the Consumer Protection Act claim that he made. And, in fact, in 2011, in his bankruptcy filing, he listed a unfiled claim against Bank of America as among his assets. So on penalty of perjury, among my assets are a claim against Bank of America. More than four years passed between that and ultimately filing this claim, so the district court was correct that it was untimely. If there are no questions, I'll turn it over to Mr. Hoffman to address the declaratory judgment. Thank you. Thank you. May it please the Court, Counsel, Mike Hoffman for Aquin Loan Servicing U.S. Bank. I'm going to address quickly the declaratory judgment claim, count five in the complaint. In that claim, Mr. Burrington sought a declaration that the assignment of his mortgage to the 2005 E-Trust was void as a matter of New York trust law. The district court entered judgment in our favor. This Court should affirm for two separate independent reasons. First, after the judgment below, the Ninth Circuit held in Ray Turner, that an assignment to a New York trust that apparently is allegedly out of time is not void but merely voidable. So the specific declaration that the plaintiff sought was incorrect. The distinction between void and voidable is significant here because a voidable transaction can be set aside by the parties to the transaction if they choose or ratified if they choose, but a third party has no right to come in and question it. So on the merits, the declaration that he specifically sought, that the assignment was void, was incorrect as a matter of New York trust law. So the judgment should be affirmed on the merits. Second, on the issue of standing, the basis for this decision below, Mr. Burrington does lack standing as a matter of New York and Montana substantive law to challenge the assignment to the 2005 E-Trust. It's not an issue of Article III standing. It's an issue of whether or not the State law gives him a substantive right to challenge an assignment that he is a stranger to. And under both New York law, which we think applies here, and the law of Montana, a stranger to an assignment cannot challenge the assignment in court. So also for that reason, lack of standing, the district court properly entered — excuse me, properly denied Mr. Burrington's claim for declaratory judgment, and we think that judgment should be affirmed. Unless the Court has questions. Thank you. Thank you, Your Honors. I think that — I think I heard, and if I didn't hear it the right way, what I wrote down at least was that what I think counsel for the Bank of America said, what the common advice is to a borrower is an option to avoid ultimate foreclosure. And if that is the common advice, then the uncommon advice is an option which doesn't lead to that end, cannot have any possibility of leading to that end. That can't be normal advice for a bank to give to a borrower. We would agree that normal advice would be something that would help them avoid foreclosure. Just like in my example, if they told him go write a letter to President Obama every Friday, which would be — it's an absurd example, but it's no more likely to lead to a modification than telling him to apply for HAMP. And, you know, there was some discussion about what he knew and when he knew it, references to excerpt of record pages 83 and 84. I think if the Court looks at those, even particularly in paragraph 37, he's getting these mixed messages. He's saying, well, we don't have more information, but keep applying for HAMP because it's out there as an option for you. And, you know, in terms of he did disclose on his bankruptcy a claim, that was something that the district court judge noted. But what we — what that doesn't factor into is the fact that the bank engaged in conduct after he listed that claim. So even if there's some parsing where we say, well, look, a claim that was prior to that date, you knew about it, and it's time barred, even if the Court got to that point, which it didn't, actions which happened after that date certainly can't be captured by that claim. And he filed that bankruptcy in April 2011. Another thing that's important there is if the Court looks at Rustad, which is another Montana Federal District Court case, because what happened in Rustad is very similar to what happened here. The bank kept telling the borrower that it was going to foreclose, it was going to foreclose, it was going to foreclose. And the district judge said, well, look, you're kind of telling the guy that he might get foreclosed, but he might have a loan modification. Therefore, your damages aren't stabilizing until they take that action and foreclose. So if we apply that same rationale here, and we go back to that July 8, 2013 letter, where they are still telling him that you can go for HAMP as an option, then we have to also conclude that by their actions, not anything that our client did, they strung this thing out so that the accrual date was at least to July 8, 2013, because he claims that he was never told that HAMP wasn't an option. And in the complaint, he does recount the time that they said, you're not, you can't get this loan modification, we'll try an in-house. He asked to find out why, and he says they hung up on him and wouldn't tell him. One thing I do want to ---- But the statute of limitations doesn't depend on whether he understood why or not. It just depends upon whether they showed him, right? Sure. Exactly. But the problem that they have is that July 2013 letter, where they're still telling him that HAMP is an option. And, you know, it's amusing for us because they say, well, he should have been smart enough to know that wasn't true. And the Montana Supreme Court addressed that in Morrow when it said, Bank of America, the same defendant here, is telling the borrower, you can rely on what we say on Monday, but not what we say on Tuesday, you know. And then I'm out of time, so if the Court doesn't have any questions, I will rest. Thank you. Thank you very much. Thank you for your argument to both counsel. Also, for your patience in waiting until the end of a very long calendar, the case of Burrington v. Ocklin, loan is submitted and will adjourn for the morning. Thank you.
judges: McKeown, Paez, Bashant